## AIR REDUCTION CO., Inc., v. PHILADELPHIA STORAGE BATTERY CO.

(Circuit Court of Appeals, Third Circuit.
June 22, 1926. Rehearing Denied
October 12, 1926.)

No. 3383.

**1. Negligence ⊜⟶136(17)—Whether oxygen manifold installed by defendant was made of proper material, and properly made and machined held for jury.**

In an action for fire damage to factory, due to defendant's alleged negligent installation therein of oxygen manifold, evidence *held* sufficient to go to jury on questions whether steel was a suitable material for use in such manifold and whether the manifold was properly made and machined.

**2. Appeal and error ⊜⟶215(1).**

Objection cannot be first made on appeal to form of submission of particular question.

**3. Appeal and error ⊜⟶215(3).**

Failure to object to form of submission of question does not preclude party from raising question that there was no evidence to warrant submission of issue at all.

**4. Negligence ⊜⟶136(25).**

Proximate cause is question of fact.

**5. Evidence ⊜⟶150—Testimony of expert witness as to result of experiments held properly admitted, in view of objection to experiments in court.**

In action for fire damage to factory, due to alleged negligence of defendant in installing therein an oxygen manifold, where defendant by objection prevented the making of experimental tests in court by expert witness, it was not error to permit witness to testify as to result of experiment previously made by him, where no fact making results undependable was called to court's attention.

**6. Witnesses ⊜⟶269(2)—Refusal to permit cross-examination concerning matter relative to which witness was not permitted to testify on direct examination held not error.**

Refusal to permit defendant to cross-examine witness relative to a letter *held* not error, where defendant had successfully objected to direct testimony of witness concerning such letter, on ground that letter itself was best evidence.

**7. Appeal and error ⊜⟶1050(2)—Negligence ⊜⟶126(2)—In action for negligent installation of oxygen discharging manifold, testimony that witness had told head of defendant's engineering department that material was not proper for charging manifold held either harmless, as irrelevant, or pertinent, as showing defendant's knowledge.**

In action for fire damage to factory, due to alleged negligence of defendant in installing oxygen discharging manifold therein, admission of testimony that witness had told head of defendant's engineering department that he did not believe material of which the manifold was constructed was proper material for a charging manifold *held* either harmless, as irrelevant, or pertinent and admissible, as showing knowledge of defendant of alleged dangers.

**8. Evidence ⊜⟶539.**

One who from his boyhood had worked for manufacturer of high pressure gas apparatus, until he became president of similar company, *held* qualified to testify that oxygen gas manifold should be constructed of brass, instead of steel.

**9. Negligence ⊜⟶124(1)—Evidence of reputation of firms making various parts of manifold furnished by defendant, charged with negligent installation, held inadmissible.**

In action for fire damage to factory from defendant's alleged negligent installation therein of improperly machined oxygen manifold, evidence of general reputation of firms from which defendant purchased various parts of the manifold *held* properly excluded.

**10. Negligence ⊜⟶124(1)—Evidence on question of how machining on manifold furnished by defendant, charged with negligence, compared with other machining held inadmissible.**

In action for fire damage to factory from defendant's alleged negligent installation therein of an improperly machined oxygen manifold, testimony bearing on question of how machining on such manifold compared with other machining *held* properly excluded.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Charles L. McKeehan, Judge.

Action by the Philadelphia Storage Battery Company against the Air Reduction Company, Inc. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 274 F. 216.

Francis B. Bracken and John M. Clarke, both of Philadelphia, Pa., and Charles K. Carpenter, of New York City, for plaintiff in error.

William A. Glasgow, Jr., Robert Dechert and C. J. Hepburn, all of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and BODINE, District Judge.

BUFFINGTON, Circuit Judge. In the court below, the Philadelphia Storage Battery Company, a corporate citizen of Pennsylvania, brought suit against the Air Reduction Company, Inc., a corporate citizen of New York, for damages to its factory by a fire started by alleged negligence of the Air Company. The case, which was tried for four weeks by the late Judge McKeehan, resulted in a verdict for the plaintiff, and on entry of judgment thereon this writ of error was taken. The questions involved in the case are: First, was the defendant entitled to binding instructions in its favor? Second, did the court err in admitting certain evidence on the side of the plaintiff? And,

third, in rejecting certain evidence tendered by defendant.

Briefly stated, the pertinent facts are: On January 26, 1920, the Air Company, by written contract, undertook to supply, and the Storage Company to purchase, all the oxygen gas the latter required for three years. The gas was to be brought to the plant in the Air Company's tanks, and their contents distributed to the Storage Company's plant through what is termed an oxygen manifold. The valves of the tanks were to be operated by the Storage Company, but the manifold was constructed by, and remained the property of, the Air Company. The design and make of the manifold and the entire installation and operation of the apparatus was the design and work of the Air Company, the Storage Company having no part or knowledge thereof. The Air Company undertook to initially instruct the Storage Company's men when the installation was completed, and did so, warning them not to use grease. Generally speaking, the manifold consisted of a square bar of steel a few feet long, with an interior chamber formed by drilling from end to end. Into the manifold the oxygen was charged from the tanks, and from it such gas was distributed to the Storage Company's works. The Air Company brought its manifold, which was mounted on a plank, and left it for several days along the outside of the wall of the Storage Company's plant. Thereafter it was put in place by the Air Company, and its oxygen tanks duly connected therewith by March 17, 1920. On that day, the Air Company's installing agent instructed the Storage Company's employees, who thereafter operated it, how to do so. This manifold was only the fifth the Air Company had installed for the purpose of discharging high pressure gas, the proofs being that it was then "practically commencing the business of furnishing appliances, or at any rate manifolds, for use by consumers." The Storage Company operated the installation until March 24th, when, while gas from a fresh tank was being turned into the manifold, the latter exploded at a point directly in front of the tank, and threw out flames and sparks in all directions, from which the factory caught fire and was destroyed. The proof was the operatives had used no oil or grease in their work.

Under the charge of the court, the case narrowed to two charges of negligence, clearly and tersely stated therein, as follows: "The particular negligence that is charged in this case is this: That in making this manifold for discharging purposes, what I will call this discharging manifold, out of steel, especially out of drilled steel, the defendant was negligent, in that it selected a material that it should have known was improper for that particular appliance; and the second ground of negligence charged is that, aside from the material of which the manifold was constructed, it was not properly made—it was not properly machined. The charge is that it was carelessly drilled."

As to the duty of the Air Company to furnish a proper manifold, the court charged: "Of course, before you can decide whether a man fails to exercise due care, you must first get in your mind a standard of what duty he owes. What was due care? What duty did this defendant owe this plaintiff? This defendant had undertaken to furnish this plaintiff with a discharging manifold, and it sent its men there and installed it. That meant, gentlemen of the jury, as a matter of law, that the defendant owed this duty to the plaintiff: That in making and installing that manifold it would exercise due care under all the circumstances of the case, and this involved the selection of a proper material for the manifold, and a suitable design and suitable workmanship. As I recall it, there is no complaint made, at least no emphasis has been made, of the design of the manifold. The complaint, as averred in the statement and as disclosed in the testimony and in the arguments of counsel, is the complaint I have outlined—that they selected the wrong material, and that, secondly, in the workmanship and drilling of that steel bar they were careless."

No objection was made to the charge, or to the mode in which the court submitted these two issues; but the court was duly asked to give binding instructions in behalf of the defendant, and the first question now is whether it erred in refusing such request. [1] Assuming, for present purposes, that the testimony given by the Storage Company was properly received, it is clear the court would have committed error in taking the case from the jury. Without entering into a discussion of the testimony, pro and con, which was some 40 days in its taking and covers some 1,300 pages, it suffices to say that it tended to show the manifold was not made of proper material and was actually constructed in a manner that made it dangerous to use. The oxygen here involved

was inflammable, and where delivered under high—2,000-pound—pressure becomes of such high temperature that, when it comes in contact with such articles as coal dust, waste, oil, grease, or small steel clippings, will explode and burst into flame.[1]

There was testimony that, in case of the explosion of oxygen gas in a closed chamber, such as a manifold, the walls of a copper or brass chamber would not burn, but the fire would burn itself out inside the chamber without harm; but in case of a steel chamber the fire would feed on the metal walls of the chamber, and perforate it and spread the flames abroad on the outside. It was also shown that the proper and usual practice was to use brass or copper, and not steel, in making manifolds, and that, when made of steel, those that were drilled were more susceptible to burn than those made of pipe.[2]

From the citations referred to in the margin, which are but a minor part of the many additional ones that could have been made, it will sufficiently appear that the court was constrained to submit to the jury the question first stated, namely, that in making the "manifold out of steel, especially out of drilled steel, the defendant was negligent, in that it selected a material that it should have known was improper for that particular appliance." Finding, as we do, no error in the court's action in that regard, we turn to the next question submitted, namely, whether, "aside from the material of which the manifold was constructed, it was not properly made, it was not properly machined."

In that respect it was contended the manifold was drilled from both ends; that the two drills did not center properly, but left a shoulder; that the drilling left rough plac-

---

[1] Bearing on the danger of oxygen gas, reference is made, inter alia, to the testimony of Luening: "Q. Was or was it not known in the art prior to 1920 that oxygen gas under high pressure was a highly dangerous element?. A. It was known as being highly dangerous and treacherous, if not properly handled."

[2] Bearing on the dangerous character of bored or drilled steel manifolds, reference is made, inter alios, to the testimony of Luening: "Q. Prior to 1920, was it known that oxygen under high pressure, brought into contact with steel, bored steel, was highly dangerous or not? A. Yes, sir; it was known and considered as being dangerous. * * * Q. Is there any difference, or was there any recognized difference, between the use of a broad shiny inside of a steel manifold as compared with a steel or iron pipe? A. Yes, sir; the thought was that an iron pipe was safer than bored or drilled steel, because in the process of manufacturing iron pipe the inside and outside as well is practically completely oxidized. In other words, it is already burned. You cannot burn it any more. Q. That is what you mean by oxidation—that the film or skin on the pipe has already been burned? A. Yes; it is protected with a nonburning film, so to speak. The same is true of the fittings. Q. Then, is there the same change of ignition, where you have an oxidized iron pipe, as compared with a clean hole drilled through the steel? A. No, sir; that is why we changed."

So also that of Ruck: "Q. Is there such danger? A. Yes. Q. In what respect? How could that occur? A. That foreign matter will either remain or will be introduced, which will cause combustion when in contact with high pressure oxygen. Q. Is there any danger of that material coming from the cylinder? A. There is a possibility. Q. How about it coming from the outside air, dust, or coal dust, anything like that? A. There is a possibility of that every time an empty tank is taken off and a new tank is connected. * * * Q. Can you give us the reason why nonferrous metal, or brass, was used for the manufacture of manifolds for the discharge of oxygen gas under

high pressure in preference to ferrous metal, steel or iron? A. Yes; it was considered in Europe as highly dangerous to use steel for high pressure oxygen discharging equipment. Q. And when you say it was highly dangerous, and so considered in Europe, do you know how it was considered here in America? A. So far, I did not hear anything else. Q. And when you say dangerous, what do you mean might happen? A. The steel will be ignited, so that the burning steel will fly in every direction, and set afire whatever combustible material is within the range of these burning particles."

Bearing on steel chambers being combustible, and copper and brass ones not, reference is made, amongst others, to—

Luening: "Iron, in an atmosphere of oxygen, if lighted at one point, will continue to burn until it is consumed, provided the oxygen lasts. Brass or copper in an atmosphere of oxygen, if you light it at one point, it won't burn, whether the oxygen lasts or not."

Haslam: "Q. As I understand you, steel in an atmosphere of pure oxygen—I mean nearly pure oxygen—is a combustible material and will continue to burn if ignited in that period? A. Yes; that is correct. Q. I ask you about copper or brass. Is copper or brass a combustible material? A. Copper or brass is not a combustible material in pure oxygen, neither is it a combustible material in oxygen up to 2,000 pounds pressure. Q. Suppose copper is heated hot in a furnace and put into a tube of oxygen. Will it burn? A. No, sir; it will not burn; it will merely melt."

Bearing on the danger of contact with inflammable articles, reference is made, inter alios, to the testimony of—

Luening: "Q. Was there any recognized knowledge in the industry prior to 1920 as to dangers arising from accidentally getting into the manifold any character of material, increasing the hazard, in a discharging manifold? A. It was recognized that the introduction of combustible materials in any quantities, in any amounts, would increase the hazard. Q. Combustible materials of what type or character? A. Particularly grease, oils, even cotton waste,

es, fins or splinters, all of which increased the manifold's liability to combustion. It was also contended that the drilling was faulty, in that pockets were formed under the manifold's intake valves, in which foreign combustible matter might gather, and.

in addition thereto, these small and confined spaces were such that suddenly in-coming oxygen would therein rise to a higher temperature than elsewhere in the manifold, and that this latter proved to be the case in this particular manifold.[3]

string, packing materials that were combustible, anything of that general character; coal dust, carbon, charcoal, graphite. Caution was always exercised to eliminate any materials of that kind."

Haslam: "Q. Take the question of whether steel or wrought iron is a combustible material in connection with oxygen under high pressure; how long has that been known as a principle? A. As I believe I stated the other day, it has been known—I don't know; at least 100 years, I presume. I have known it since 1905 or 1907. * * * Q. Will you tell us whether or not oxygen gas, under pressure of 2,000 pounds, is considered safe or dangerous? A. It is considered highly dangerous, for example — I think it is generally considered dangerous."

Dickinson: "Q. I will ask you whether or not oxygen gas is or is not a highly dangerous element? A. I consider that it is; yes. Q. Why? A. Because oxygen is one of the most active of the chemical elements, and can combine with destructive energy with a number of common materials; therefore, when oxygen comes in contact with any of a number of very common materials, there is liberation of an enormous amount of energy. Wherever there is excess of energy available, there is required the utmost care and precaution in handling such a system. Q. Speaking of these common materials, is steel or iron one of the materials that you refer to? A. Steel and iron are perhaps the best known of the combustibles of oxygen, because the main use of oxygen, one of the main uses, is to burn steel or iron."

Hersey: "Q. Had you also investigated and made investigations of oxygen gas under pressure of about 2,000 pounds to the inch? A. Yes. Q. Will you please state whether, under a pressure of 2,000 pounds to the inch, whether or not it is or is not a dangerous element? A. I should call it dangerous. Q. Why? A. It is classified as a dangerous article by the Interstate Commerce Commission and by the Bureau of Explosives of the American Railway Association, and it has come into my personal knowledge, because it is liable to cause fires and explosions."

Mathews: "Q. I will ask you, from your long experience which you have given us an account of, whether oxygen gas under high pressure is a highly dangerous or a safe element? A. Oxygen gas under high pressure, unless proper provisions and precautions are taken in the handling of it, is highly dangerous."

Ruck: "Q. Are you able to say whether or not oxygen gas is a highly dangerous element under high pressure? A. I consider it very dangerous under high pressure. Q. Are you able to say whether or not steel or iron, used in connection with oxygen under high pressure, is a dangerous material to use? A. It must be considered dangerous in most cases."

Bearing on the rapid admission of oxygen

gas under high pressure into a confined chamber generating high heat, reference is made to—

Luening: "Q. You spoke of the pressure of the oxygen, the high pressure, resulting in increased heat, as I understand it, if suddenly applied. A. If suddenly applied within a confined space, the higher the pressure the greater the degree of heat. * * * Q. The wider you open it, assuming you open it suddenly, the greater the pressure you get in the manifold suddenly applied? A. Yes. Q. That is one of the hazards? A. That is one of the hazards, the sudden opening of the valve or sudden releasing of the pressure into a confined space."

[3] Bearing on the question of drilling from both ends, of leaving fins and of forming pockets, reference is made to—

Luening: "A. In examining the manifold, I noticed inequalities on the surface, rough edges. Q. On the surface. What do you mean by surface? A. On the surface of the drilled hole, the shoulders, what is known as fins; that is, the roughness, due usually to cutting off a pipe, or something of that kind, sharp edges at the— Q. Continue. A. Sharp edges at the holes drilled in the manifold for the valves, the smoothness and cleanliness of the surface, because it was well known in the industry at that time that a smooth, clean, steel surface was much more readily burned than a surface which had previously been oxidized. It was also well known in the industry at that time that fine particles of combustible material, such as the sharp edges I referred to, increased the possibility of burning. Q. Burning by what? A. Burning by the application of oxygen. Without oxygen steel will not burn. Q. Then, as I understand you, you specify that in the boring in this manifold rough places were left? A. Yes. Q. And shoulders? A. Yes, sir. Q. And what you call fins, which, as I understand it— A. That is a fin, and this is a fin. Q. And sharp edge places? A. Sharp edge places at the exit of the drill from the hole usually. Q. And the fact that the hole has bored through for the insertion of the valve on top of the manifold, the edges were left sharp? A. Yes. Q. And rough? A. Yes; that is what I mean by fins. Q. It was rough? A. Yes; rough and sharp. Q. Will you please state whether or not it was known at the time, 1920 and prior thereto, that danger of combustion or fire in the introduction in the manifold of this character of oxygen gas at high pressure was increased or decreased by the matters that you have specified? A. As I have stated, it was known in the industry that hazards would be increased by the existence of the defects that I have specified. Q. In examining that manifold, are there any other specifications, other than what you have referred to, other than the shoulders and the fins and the sharp edges? A. I noticed an offset; that is, where the drills— They evidently had drilled from both ends, and the drill did not quite meet, and left a shoulder in the

In view of the testimony noted in the margin, and without reference to other proofs to which reference might be made, we think there was sufficient evidence to warrant submission to the jury of negligence in making the manifold. And in doing so the court called attention to the proofs and contentions of the defendant, namely, that its material was safe, was in accord with the alleged common practice of others in the same line of work, and that its workmanship was not bad or faulty.

[2, 3] We here remark that in the court's charge, and, as there was no exception to it, we assume the atmosphere and conduct of the case, by the understanding of counsel, centered the question of negligence on these two issues, and the verdict conclusively establishes the defendant's negligence in both regards. So, also, the court, in its charge, submitted to the jury, in a form to which no exception was taken, the question of the cause of the fire and whether it resulted from the defendant's negligence. So that no objection can now be made to the form of submission of that question. But this, of course, did not preclude the defendant from now raising the underlying question, which

it did by its request for binding instructions, namely, that there was no evidence from which their responsibility for the fire could be inferred.

Addressing ourselves to that question, we think the proofs were such that the court was bound to submit the question to the jury, in view of certain proofs, of certain facts, viz. that the plaintiff's plant was burned; that the fire which burned it emanated from the manifold; that fires in a manifold were of common occurrence; that, when such fires began, they were liable to be fed by, and to consume and perforate, the chamber walls of a steel manifold, and especially of one drilled as this one was; that after the fire the particular manifold here involved bore physical evidence that such had been the course of events. All of these proofs, and other facts, factors, and proofs of the plaintiff to which reference could be made, combined to make a situation which the court properly submitted to the jury in these discriminating words:

"So far as the particular cause of this fire is concerned, you have heard a great deal of testimony on that. You have heard at least two, and perhaps more than two,

---

center. Q. Are there any pockets in it at any place? A. Yes; several pockets. Q. Where are they? Can you point them out? A. Immediately adjacent to the valves. I do not know where they come from, but under each valve. Q. Is it shown in there, what you speak of as a pocket? A. Yes; under each valve. These drilled holes under each valve. Q. What, if anything, would be the possible effect of leaving pockets of that character in it? A. That permits the introduction of oxygen under high pressure into a confined space. The smaller the space the higher the pressure, the greater the heat or less radiation, and therefore the greater possibility of ignition. Q. Of ignition? A. Of ignition, of lighting, of burning it."

Mathews: "A. In the method of drilling this piece of material it is evident that no especial care was taken to prevent sharp edges, pockets, contraction of passages—I mean, by contraction of passages, such places as the drilling under the valve and the smaller hole entering into the main bore of the piece of material, and the rather roughness of the bore, the sharp edges which contain what we call fins, sometimes called fins or ragged edges, as generally spoken of in the machine shop as a result of drilling one hole into another hole, and roughness, unnecessary roughness, where apparently the drilling from one end and the drilling from the other end did not meet very exactly. Q. Will you state whether the matters that you have pointed out on this particular manifold—whether they did or did not add to the hazard of using this manifold in connection with oxygen under high pressure? A. The points which I have brought out would add to the hazard of such a piece of material drilled or bored in that manner, speak-

ing of boring as the usual drilling in, particularly from the outside into the center bore. Q. One of the points that you specify was roughness, where the drilled holes seemed to meet. In your view, this manifold was drilled from both ends at the same time? A. Not from both ends at the same time, but it was drilled apparently from opposite ends. Q. From opposite ends; therefore the drilling would meet at some point in the chamber of the manifold? A. It was the intention to have it meet, of course. Q. And one of the points you point out is right there, where you say there is a roughness, and that was caused by the drills not quite meeting properly? A. Yes; and a shoulder at that point, in there where the drills operating from opposite directions—there was a mismatching of the surface. Q. Another point that you speak of was the pockets being left with the sharp edges. Are those the pockets you referred to, right under the brass valves that go into this? A. Yes, sir. Q. And are the sharp edges you speak of such as appear there at these pockets? A. They are the sharp edges which appear, both at the side where the larger boring is for the valve, and where the smaller hole enters the larger hole. Q. And where are the little places that you speak of as fins or ragged edges? A. Where the drilling through from the larger recess into the central drilling of the piece has broken through, as the drill breaks through from one point to the other. Q. In your opinion, was the use of this manifold in connection with oxygen gas, under high pressure for discharging that oxygen gas, safe or dangerous? A. I should give my opinion as to a manifold of that character, of that construction, that method of construction, used

opinions advanced as to what caused it. You may think that some of those opinions show you what was the real cause of the fire. You may conclude that none of those opinions or theories advanced satisfactorily explain the fire. You may conclude that this fire is of a mysterious and unknown origin. Of course, a good many accidents happen that way. They would not be mysterious or unknown as to their causes, if you knew all of the facts. If you were in possession of every factor that entered into the situation, or every fact, you could always explain a phenomenon of this sort. The difficulty very often is that the known data, absolutely ascertainable and known data, are not sufficient to enable one to say with certainty that this, that, or the other was the cause of it. The main question in this case is not for you to decide what was the cause of the fire. If you find that the defendant in using steel, and more particularly in using drilled steel, as a manifold, was negligent, or that, having selected the drilled steel, it made it in a negligent way, and that this negligence was the probable, natural, and reasonable explanation of the fire, then you should render a verdict in favor of the plaintiff. If, on the other hand, you conclude that, under the evidence, the plaintiff has not shown that the defendant failed to use due care in making and installing this manifold, then that ends the case, and your verdict should be for the defendant.''

It goes without saying that there was weighty testimony before the jury on the part of the defendant to the contrary, and that the fire emanating from the manifold was due to other causes, and that our not citing it or discussing the conclusions drawn from it, does not mean we have overlooked or ignored it, or not appreciated its worth. We have confined our reference to the plaintiff's proofs because, if they were such as constrained the court to submit the case to the jury, no error was committed in so doing, and the defendant's case then rested on its ability to satisfy the jury that the proofs on its side overmastered the plaintiff's. We think the authorities warranted the court in submitting the case to the jury.

[4] Proximate cause is a question of fact. Did this manifold, which the verdict establishes as either made negligently, or of improper material, cause the fire? Was the

---

under such a condition of discharge, as you term it, if made of steel, to be dangerous. Q. Can you explain why you think it is dangerous, why you consider this manifold dangerous, in your own way? A. I would consider that manifold dangerous for several reasons. The introduction of oxygen at high pressure, passing into the manifold through the valves, might be called introducing valves to the manifold body, passing in through a small opening. Under that opening there is a pocket, and below that pocket there is a restricted opening. By 'restricted opening' I mean an opening that is smaller than the pocket directly under the valve. That is sharp. I might better explain it, angular, a square-edged opening, before it passed into the body of the manifold, which creates excessive friction. The entry of the gas from the valve through that small hole into the larger apparently drilled hole in the body of the manifold, due to the pocket being in there, will form a certain amount of vacuum in the passage of the gas into the body which would allow any foreign material that might enter there to remain at that point. The entrance of the gas from the valve into the body and through the restricted hole which I have spoken of, creating heat at that point, due to friction, creates a hazard of heat. The oxygen gas entering into the manifold, the body proper, would recompress at high pressure, it would compress whatever is in that pocket at low or possible atmospheric pressure to a high pressure, thereby creating heat in the manifold. The oxygen gas in the manifold, being introduced to it suddenly would cause heat to be created in the manifold, due to the sudden entry of the gas into the manifold by the impact of the jet of gas. The combinations of heat in the manifold—there is the possibility of that heat rising to a very high temperature in there, because of the various matters which I have already stated, and under oxygen, if ignition should take place, or combustion take place inside of the manifold, the iron would burn, and under the high pressure the oxygen and the supply of it would continue to burn. In that manner the manifold in its construction I would consider is dangerous. Q. You speak of combustion taking place, or ignition, and the iron burning under oxygen, after ignition. Would brass burn the same way? A. I should say not."

Ruck: "A. This set-off I consider highly dangerous; this set-off here, this rough edge. That should not be, because the oxygen rushing under 2,000 pounds pressure out of that small orifice at a terrific speed is heating this edge. It may and may not ignite, but if, in addition to that, there should be any trace of oil or fat, or any fatty substance, these conditions are given under which an explosion may occur; that trace of fat may ignite, and of course combustion would start immediately. There are other points here which I consider more dangerous. You see, here the oxygen is rushing through these small holes, and is heating these sharp edges. You see, I pass it here with my nail. The edge, the thin edge, is holding back my nail. You can try that for yourself. That is a most serious point, or one of the very serious points in the whole thing. I would construct it entirely different. However, all these points I consider of minor importance, and the essential fact is that nothing would have happened if the part had been made entirely like this part here, but of brass."

manifold one save for use of which no fire would have occurred? All these were questions fairly raised by the proofs, and if the jury found them in favor of the plaintiff, if they found that but for the presence of such a manifold as defendant furnished, no external communicating fire would have occurred, then they were justified in concluding that this manifold, which the defendant ought not to have furnished, and which was only there and in use by reason of defendant's negligence, was, in the eyes of the law, the proximate, dominating cause of the external, communicating fire which followed.

Turning, next, to the alleged errors in admitting testimony on the plaintiff's side of the case, we note that the assignments, many in number, group themselves under a few heads, viz.: First, as to the cause of the fire. In taking up these questions, it is well to note the nature of the case; its highly technical subject-matter; the consequent compelling necessity of scientific information to enable the court and jurors to understand the situation; the character of materials used; the dangers incident to their use; the enlightening information given by highly skilled, technical men on these points, all of which enabled court and jury, and without which they could not, to intelligently understand and fairly decide the case. Indeed, its unusual character is evidenced by the fact disclosed in the proofs, namely, that the Bureau of Mines of the Department of the Interior of the United States government detailed one of its scientific staff, Dr. Hersey, physicist in charge of the physical laboratory of the bureau, to attend this trial to hear the evidence, and with leave to give his testimony on the subject-matter, if called upon by either party.

[5] In the course of the trial, Dr. R. T. Haslam was asked the question whether, "from your own experience and the experiments you have conducted, have you any opinion as to, or any explanation as to, how the fire occurred at the Philadelphia Storage Battery Company?" To which he replied he had such opinion, whereupon he was permitted to state his explanation, hereafter quoted, and such ruling is now assigned as error. It will be noted that theretofore testimony had been given showing that Dr. Haslam was professor of chemical engineering at the Massachusetts Institute of Technology; that he had a high-grade technical training, had large experience in gas engineering, and

had the practical supervision in such elements in the practice, management, and supervision of the plants of large companies; that he had made extensive experiments, as to the nature of all of which he testified before the jury—subjecting steel manifolds, such as here involved, to the effects of oxygen gas suddenly admitted under high pressure, into a manifold, and that he had attended the trial and heard all the testimony.

It will be noted that, in making these experiments, Dr. Haslam had had the manifold the defendant installed reproduced; two analyses of its steel made by independent chemists; then obtained in the open market steel answering such analyses, and reproduced the manifold's exact size and shape. As showing the correctness of the manifold and the fairness of the experiments, the witness was asked if he had such experimental apparatus in a room adjoining the place of trial, and an offer was then made and permission asked to submit it to the experimental tests. As the defendant, by its objection, thus prevented fairness and fullness of the experiments being subjected to scrutiny, test, and cross-examination, we think the court was justified in receiving the testimony as to the experiments the witness had made in the use of oxygen gas on the manifold and the results thereof.

The evidence of substantial identity, fairness, and duplication were such as to admit such testimony for the consideration of the jury, and it will be noted that, in making the objection hereafter noted, the court's attention was not called to any fact, which was proved or not proved, or any article, used or unused, which made either the experiments unfair or the results shown by them undependable. Under these conditions, Dr. Haslam testified as follows:

"A. Going to the testimony, as I heard it, Mr. Berrera, I believe his name was, was connecting a cylinder to the second valve away from the King valve. Q. Was connecting a cylinder? A. He just connected it. Q. Had connected it? A. Yes, sir; prior to the time I am speaking about. Q. Yes. A. He opened the valve, at least partly, allowing the oxygen to rush into the manifold. The period of time after that oxygen rushed into the manifold and the time of the fire appears to be rather short, namely, Mr. Riley, I believe, had not time to hand him a wrench, to get a wrench and hand it to him, when he noticed fire breaking out. That would correspond in time to the time of our fires. Q. When you speak

of 'our fires,' what do you mean? A. The fires we had with this same manifold, experimentally. I think the oxygen rushing into this manifold produced certain heat at this end of this section here (indicating), this section that is burned, and where it connects to the brass section; that joins this further section with the burnt section. Q. Joins the section farthest from the King valve with the section nearest to the King valve? A. Nearest to the King valve. I think at that point, or else in the pockets underneath the valve, between the second valve, away from the King valve, and the end of this (indicating) drilled steel bar, there were a small amount of easily ignitable materials, such as I have enumerated. The oil, for example, might have got in from drilling the holes, might not be thoroughly cleaned off, because it is extremely difficult to clean off lard oil from metal. The coal dust might have gotten in from the manifold setting around the yard, as has been testified, and the cotton waste might have gotten in from drilling out this roughly drilled manifold. This easily ignitable material was, in my opinion, ignited by the inrush of oxygen, and that little, incipient fire inside of the manifold communicated itself to the steel manifold, and then the steel manifold burned, sending molten metal down onto the other oxygen cylinders that were there, liberating the oxygen within the little shed outside of the Philadelphia Storage Battery Company's building. This molten metal, scattering around, particularly in the presence of all this oxygen blowing into the shed, caused the shed to catch on fire, and the uprush of the flames blew the hot oxygen and flame into the building. * * *

"Q. In your opinion, Professor Haslam, if that manifold had been made of brass, that same material as the connecting tubes between the different sections of the manifold and of the valves on top of the manifold, could that fire have occurred? A. In my opinion, the fire could not have occurred, and that information is based upon general knowledge of these materials and on our experiments. Q. I will ask you, further, one question. Are any of the chemical principles or physical principles, which are involved in the experiments, which you conducted, new? A. No, sir; we did not do anything that was new or startling. We merely put small amounts of easily ignitable material, such as could ordinarily get in. We merely turned the—opened the valves in such a manner, such as any workman might. We found it much easier to burn the manifold, if there is any slight leak—"

At the conclusion of the witness' testimony and after full cross-examination, the ruling of the court and the objections thereto were summarized by defendant's objection as follows: "In order that the record may be perfectly clear, I move to strike out the testimony of Professor Haslam, so far as he has assumed to express an opinion as to the cause of the fire in 1920, which is the basis of this action, he having expressed that opinion upon the assumption of facts which are not established, and, secondly, upon the assumption of facts which would, if true, constitute negligence on the part of the defendant, not at all averred in the plaintiff's statement of claim as a ground upon which this action has been brought."

As to the first objection, viz. "the assumption of facts which are not established," we have heretofore noted defendant's not calling to the court's attention any such omission in the preceding mass of testimony as then enabled the court to correct its ruling, or to give opposing counsel the opportunity to supply it. Indeed, the gravamen of the objection then made, as it now seems to us, was that the testimony should be ruled out, because, if true, it was for a cause of action not averred in the pleadings, a mistaken contention, as we view the plaintiff's statement of claim and this testimony. Without referring to the testimony of the other scientific, professional, and practical witnesses, versed or experienced in the use of oxygen gas, it suffices to say that we have considered the rulings made in the receipt of their testimony and find no error.

[6] It remains to consider the testimony tendered by the defendant and not received. On the examination in chief of plaintiff's witness Luening, he was asked about the contents of a letter and a blue print received from the British Oxygen Company. On objection of defendant that the contents were best proved by the papers themselves, plaintiff dropped its line of inquiry. When the defendant attempted to cross-examine as to the letter, the court refused to allow this to be done. In so doing it committed no error. Not only were the papers not in evidence, but no suggestion is now made as to what information, pertinent or helpful, the question would have elicited, or what bearing it would have had on the case.

[7] Nor can we find error in the court's ad-

mitting certain testimony of Shaw, a witness for the plaintiff. He had had large experience in installation of oxygen gas plants for several years prior to 1916, when he went into the employ of the defendant, and was its representative in installing the particular manifold here in question. His testimony, in substance, was that when he began his employment in 1916, and in conversation with Mr. Roberts, head of the defendant's engineering department, he told him of a change of manifold manufacturing practice of a certain company, "together with the general knowledge I had of the dangers and happenings of oxygen plants in the country, indicated to me that the use of steel was not the proper thing in a charging manifold." We are unable to see either error or injury in this testimony. It will, in the first place, be noted that it referred, not to discharging manifolds such as are here involved, but to charging manifolds, and was therefore harmless and irrelevant. On the other hand, if, inferentially, it bore on discharging manifolds, it was pertinent as showing knowledge by the officers of the company of alleged dangers in the use of steel in charging manifolds, and therefore, a fortiori, when used for discharging manifolds, and properly went to the jury for such consideration as the jury felt it deserved, on the question of negligence in furnishing the steel discharging manifold here involved. Moreover, it showed that Shaw himself, who, as defendant's agent, installed this manifold, knew it was dangerous to use, and this wholly apart from any communication of his knowledge to Brown.

[8] We find no error in the admission of the testimony of Slava Dlouhy that manifolds should be of brass, and not of steel, because the latter would burn, and the former would not. The proofs show his experience, knowledge of the business, and practices of others warranted the court in concluding he was sufficiently qualified to testify on that subject. As a boy of 12, he began and continued working for the Ashton-Laird Company, manufacturers of high pressure gas apparatus, doing business of large volume and all over the country, until he became president of his own company, doing the same line of work. Without discussing the testimony of the witness Ruck, we may say we are likewise of opinion that his training, experience, and observation were such as to warrant the court in admitting his testimony.

Turning from consideration of the evidence concerning the material from which the manifold was made to the machining of that material, it will be remembered that the second issue defined in the heretofore quoted extract from the court's charge, was "that, aside from the material of which the manifold was constructed, it was not properly made—it was not properly machined." The nature of this alleged improper machining was specified in the court's charge, viz.: "The particular points specified are that, in the drilling, it was drilled from both ends, and where the two drills met a shoulder, which I have not seen, but you have, was left in the middle of the header, and that in addition to that the drilling left rough places in the interior surfaces of the manifold, fins I think they were called by some, little splinters, unevennesses of metal, and that this careless workmanship, as it is charged, increased the hazard which arose out of the kind of material used—increased the combustibility."

[9] The proofs showed the defendant company had no facilities to, and did not, manufacture or machine the manifold here in question. They got it and other parts of the manifold equipment from other firms, and then assembled these several parts in final shape. There was no evidence from what source or firm the particular manifold here involved came, other than this proof given by Mr. Van Fleet, the vice president in charge of operations of the defendant: "Q. By whom were these steel bars drilled and prepared, and furnished to you? A. We obtained them from two sources of supply. Q. What were they? A. The Schaefer Machine Works, Philadelphia, and Edward Purvis & Son, Brooklyn. Q. Both of these concerns, then, I understand, furnished you with all of the steel pipe that you used in any of your manifolds down to 1920, or I suppose since? A. Yes; the drilled steel bar. Q. When furnished to you for the purpose, was the steel bar drilled? A. Yes. Q. And did those concerns also do the drilling for the valves? A. The machine work was done complete on the drilled bar." Following this he was asked, "What is the reputation and standing of those firms?" Thereupon the court sustained an objection, and this is assigned for error.

No error was involved in its so doing. The court below was dealing with one particular manifold; the several parts of it were made by different firms; the assembling of these parts and making them into a manifold was the exclusive work of the defendant company; and the issue was wheth-

er this particular manifold, which, be it observed, still remained the property of the defendant, was a manifold unfitted for discharging oxygen gas. There was proof pro and con as to whether it was properly machined for such use. That was a question of fact. How could the reputation of the firm that had done the machine work affect the issue, namely, whether the manifold was not properly machined, and because not properly machined, the defendant was guilty of negligence in using such an improperly machined article? Assuredly it could not.

[10] Following this, we note the assignments touching the court's sustaining objections to admitting the testimony of several witnesses as to the machine work on the manifold in suit. At first sight, it might seem this was error; but, as the rulings of Judge McKeehan are more closely studied, one is impressed by observing how carefully he made the issues on trial govern his rulings on testimony. Bearing that in mind, it will be seen the issue here involved was not whether the steel was "a good job of machining, better perhaps than the average"; whether "you find in that piece of steel any more roughness, or fins, and so on, than you would find in a well-drilled piece of steel"; whether "the smoothness of the bore in that Airco manifold steel bar, compared with bores the result of first-class machining"; whether the witnesses "regard it as good machining"—tests put to these several witnesses, but whether the fins which were on the manifold, whether good or bad machining, made a steel discharge manifold unsafe for oxygen gas use.·

Without entering upon a discussion of other assigments, all of which have had due consideration, we draw this long opinion to a close by saying we find no error involved, and therefore affirm the judgment.